IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SHAUN MATZ,

                  Plaintiff,

       v.

MICHAEL VANDENBROOK, KURT SCHWEBKE,
ANDREA NELSON, SEAN SALTER, JOANNE LANE,
LINDA FAIT, TRAVIS BITTLEMAN,
STEVEN VASOS, BENJAMIN NEUMAIER,
MICHAEL MEISNER, JANEL NICKEL,
BRIAN BANTLEON, DONALD MORGAN,
BYRON BARTOW and TIM DOUMA,

                Defendants.[1]

OPINION and ORDER

10-cv-668-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Shaun Matz, a Wisconsin prisoner represented by counsel, has brought various claims under 42 U.S.C. § 1983 about the mental health treatment he received while incarcerated at the Columbia Correctional Institution. In addition to arguing generally that the treatment he received is inadequate, he contends that defendants violated his Eighth Amendment rights by subjecting him to conditions that exacerbate his mental illness, disciplining him for behavior he could not control because of his mental illness, transferring him to an institution that they knew would harm his mental health and failing to prevent

---

[1] I have amended the caption to reflect defendants' full names and correct spellings as reflected in their summary judgment materials.

him from engaging in acts of self-harm.

Defendants have filed a motion for summary judgment under Fed. R. Civ. P. 56 on all of plaintiff's claims, dkt. #84; plaintiff has filed a motion for leave to file a sur-reply brief, along with a copy of the brief.  Dkt. #109.  Although plaintiff has not shown that he is entitled to file a sur-reply brief, I will grant his motion because nothing in the brief changes the outcome of defendants' summary judgment motion.

In response to defendants' motion, plaintiff states that "defendants have not carried their burden of establishing that no conditions [plaintiff] is or was subject to at the hands of Defendants violate contemporary standards of decency."  Plt.'s Br., dkt. #103, at 13.  He makes similar arguments about "defendants' burden" throughout his brief.  E.g., id. at 10, 14 and 22.

Plaintiff's argument represents a misunderstanding of the relative burdens on a motion for summary judgment.  When moving parties such as defendants do not bear the burden of persuasion on a particular issue, their only burden on a motion for summary judgment is "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once that occurs, it is the plaintiff's burden to "make a showing sufficient to establish the existence of an element essential to that party's case."  Id. at 322.  In other words, even at summary judgment, it is the plaintiff's burden to prove his case, not the defendants' burden to disprove it.

With that understanding of Rule 56 in mind, I conclude that plaintiff has raised a

genuine issue of material fact with respect to his claims that defendants Michael Vandenbrook, Travis Bittleman and Steven Vasos failed to prevent him from harming himself on August 29, 2007, and defendant Benjamin Neumaier failed to prevent plaintiff from harming himself on July 2, 2009. Accordingly, I am denying defendants' motion for summary judgment as to those claims. With respect to the remaining claims, I am granting defendants' summary judgment motion because plaintiff has not adduced sufficient evidence to allow a reasonable jury to find in his favor.

The undisputed facts are set forth below. Because plaintiff did not submit any of his own proposed findings of fact as he was permitted to do under the court's procedures, Procedure to Be Follow on Motions for Summary Judgment II.B, dkt. #42, the undisputed facts are taken solely from defendants' proposed findings of fact. I considered plaintiff's responses to defendants' proposed findings for the purpose of determining the existence of any genuine disputes.

## UNDISPUTED FACTS

Plaintiff Shaun Matz is a prisoner in the custody of the Wisconsin Department of Corrections. In 2007, he had a diagnosis of an Axis I adjustment disorder with disturbance of conduct; Tourettes disorder by history and Axis II personality disorder NOS (not otherwise specified) with antisocial and borderline traits. In 2009, plaintiff had a diagnosis of an Axis II personality disorder NOS with antisocial and borderline features.

At various times between 2007 and 2012, plaintiff was housed in segregation at the

Columbia Correctional Institution. Since May 2013, he has been housed in general population at the Wisconsin Resource Center.

### A.  Plaintiff's Placement History

In August 2007, plaintiff was transferred to the Columbia Correctional Institution from the Green Bay Correctional Institution.  At Green Bay, plaintiff had been housed in segregation for various conduct reports he had received, so he remained in segregation after his transfer.

On March 18, 2009, defendant Janel Nickel (the security director for the Columbia prison) recommended placing plaintiff in administrative confinement.  (The parties do not say whether plaintiff was still in segregation at this time.)  After a hearing, the administrative confinement review committee determined that plaintiff's  placement in general population presented a substantial risk of serious harm to both staff and other prisoners.  The committee members cited various conduct reports on which plaintiff had been found guilty since 2004, including those for battery, participating in a riot, threats, fighting, escape, making and possessing weapons and damaging property.  They noted that plaintiff had used a pipe a short time before to smash windows and other property, had caused injuries to staff and other prisoners requiring medical attention and was a member of the Latin Kings.  The committee voted unanimously to place plaintiff in administrative confinement and the warden affirmed the decision.  Plaintiff was released from administrative confinement in May 2009.  (The parties do not say why he was released.)

In June 2009 Benjamin Neumaier (a correctional officer) issued plaintiff a conduct report for "disruptive conduct" and "disfigurement" after he cut himself. Defendant Nickel allowed the conduct report to proceed as a major offense on the ground that plaintiff's conduct "created a risk of serious disruption at the institution."

After a hearing, defendants Sean Salter and Joanne Lane (both supervising officers) gave plaintiff a disposition of 210 days' disciplinary separation, noting that plaintiff's disciplinary record was "horrible," he had been found guilty of similar offenses shortly before, his actions were "dangerous or disruptive," the incident was a "serious compromise of institution security" and plaintiff showed no remorse. They wrote that their disposition "must deter further violation" and "will allow the inmate to be kept in a status where his behavior can be safely managed."

On July 8, 2009, plaintiff's custody classification was reviewed by the program review committee, which consisted of defendants Linda Fait (the classification specialist) and Lane. Plaintiff stated that he wanted to go to the Wisconsin Resource Center if he could not stay at Columbia. He objected to a placement at the Waupun Correctional Institution or the Green Bay Correctional Institution because he believed those facilities would be poor for his mental health and could lead to a suicide attempt or other acts of self-harm. After considering the social worker summary, the file material and plaintiff's input, the committee chose to transfer plaintiff to Green Bay or Waupun. Psychological staff had been contacted about a possible referral to the Wisconsin Resource Center, but the necessary documentation had not yet been completed. With respect to Green Bay and Waupun, "[b]oth facilities

5

have PSU services available and can address any mental health concerns he might have. Either site can also follow up on transfer to WRC should the referral be accepted after movement out of CCI." On July 15, 2009, plaintiff was transferred to Green Bay.

In February 2010, after a hearing, plaintiff was placed in administrative confinement again. (The parties do not identify the grounds for the placement.) In April 2010, plaintiff was transferred back to the Columbia Correctional Institution, where he was retained in administrative confinement.

In August 2010, defendant Nickel again recommended that plaintiff be placed in administrative confinement on the ground that his presence in general population would pose a substantial risk of serious harm to other prisoners and staff. (The parties do not explain why Nickel made the recommendation then, even though plaintiff had been in administrative confinement for several months.) In a four-page, typed document, Nickel recounted plaintiff's criminal and disciplinary history since his first incarceration in 1996. She included the following incidents: gang-related battery of an inmate and staff member (1996), battery with a lock (1996), striking an inmate on the head (1996), fighting (1997), attacking an inmate (1997), battery of an officer (1998), two counts of battery (1999), two homicides (2003), destroying a ceiling light and injuring two staff members (2005), breaking windows and using the glass to cut himself (2005), possessing a weapon, threatening an officer (2007), refusing orders and cutting himself (2007), making threats to staff (2007), breaking windows, smashing door exit signs and fire alarms with a pipe, flooding the area with a water hose (2008), tearing apart his radio (2009), tax fraud (2009), kicking his door

and refusing orders to stop (2009), cutting his arm, splashing blood on his window and refusing to turn over the weapon (2009). She concluded that plaintiff had "displayed an unrelenting habit of assaulting other individuals and damaging property" and had received more than 80 major conduct reports.

After a hearing, the administrative confinement review committee concurred with Nickel's conclusion that plaintiff posed a substantial risk of serious harm to both staff and other prisoners. The committee members noted that plaintiff had been convicted of killing two men in 2003, that he had accumulated 87 conduct reports, that he attacked other inmates with various weapons and that he had caused a significant amount of property damage. They cited an incident in July 2009 in which plaintiff pried his screen open, smashed his window, damaged his cell light and threatened to kill staff. Although they acknowledged that plaintiff had not received a conduct report since then, they believed that plaintiff's "atrocious history of 80 plus conduct reports" was sufficient evidence that plaintiff should be placed in administrative confinement. In addition, they noted that they were "aware of [plaintiff's] mental diagnosis" and they were concerned that he had discontinued his psychotropic medication.

In January 2011, defendant Nickel recommended that plaintiff be retained in administrative confinement. In addition to the previous incidents cited in earlier recommendations, Nickel discussed an incident from August 2010 in which plaintiff was caught "fishing" with another prisoner. She adhered to her previous conclusion that plaintiff's history of assaults and property damage made him too dangerous for general

population.

After a hearing, the administrative confinement review committee concurred with Nickel's conclusion. Although they acknowledged plaintiff's "most recent improved behavior and his elevation to Step 3," they believed it would be "premature" to release him to general population.

In March 2011, plaintiff was found guilty of making threats and disruptive conduct. (The parties do not describe the underlying conduct.) As a result, plaintiff was moved from administrative confinement to disciplinary separation. In May 2011, plaintiff was found guilty of an unauthorized transfer of property and his placement in disciplinary separation was extended by 150 days. (Again, the parties do not describe plaintiff's underlying conduct.)

On October 21, 2011, plaintiff was released from segregation and placed in temporary lockup pending an administrative confinement hearing. Defendant Nickel recommended placing plaintiff in administrative confinement on the ground that plaintiff "continues to cause physical harm and mayhem wherever he is placed." She noted an incident from February 2011 in which plaintiff threatened to kill an officer and an incident from October 2011 in which plaintiff attempted to order a book for another prisoner.

After a hearing, the committee concluded that plaintiff was still too dangerous for general population. Although they acknowledged that there had been "an improvement in his behavior," he continued to receive conduct reports. In addition, they cited his involvement with the Latin Kings street gang and his extensive disciplinary history. Plaintiff

8

did not appeal this decision.

In April 2012, defendant Nickel again recommended that plaintiff be retained in administrative confinement, relying on the same information as she had in October 2012 recommendation.  The committee wrote, "[d]espite Matz's recent improved behavior and elevation to Step 3 Administrative Confinement, the Committee believes that it's premature to release inmate Matz from this status.  He has freely demonstrated disregard for authority coupled with a lack of impulse control that results in injuries to staff and inmates alike." Defendant Michael Meisner, the warden, affirmed the decision on the ground that plaintiff's recent improved behavior "did not mitigate the past serious behaviors that had put staff, inmates and the institution in jeopardy."  Meisner instructed plaintiff "to continue with positive behaviors and programming to demonstrate he would be appropriate for general population."

In November 2012, plaintiff was released to general population "[d]ue to [his] continued positive behaviors."

### B. Plaintiff's Acts of Self-Harm

On August 29, 2007, an officer making rounds saw that plaintiff had covered his cell door window with a towel.   Sticking out of his cell door was a piece of paper with what appeared to be blood on it.  When plaintiff did not comply with a directive to remove the towel, the officer notified defendant Travis Bittleman and another officer of the situation. Viewing plaintiff's cell through the trap in his door, one of the officers saw plaintiff sitting

on his toilet with an open wound on his arm. The officers notified a lieutenant and additional staff arrived. Plaintiff complied with restraint procedures for removal from his cell and was transported to the hospital for medical treatment. (The parties dispute whether defendants Michael Vandenbrook (a psychological associate), Bittleman and Steven Vasos (a correctional officer) refused to help plaintiff after he plaintiff told them earlier in the day that he feared he would hurt himself and wanted to be placed on observation. According to plaintiff, Vasos said, "The only way you can go to observation is if you hurt yourself.") When plaintiff returned from the hospital later that day, defendant Kurt Schwebke, a state psychologist, placed plaintiff on observation status.

In an evaluation dated September 25, 2007, Schwebke concluded that plaintiff was consciously aware of his own conduct and had control over it, but chose to continue engaging in disruptive, dangerous and self-injurious behavior.

On July 2, 2009, plaintiff told defendant Neumaier that he wanted to speak to Dr. Schwebke. (The parties dispute what happened next. Plaintiff says that Neumaier asked plaintiff "whether he feared at the time that he would harm himself" and that plaintiff "answered in the affirmative," but Neumaier did nothing. Dkt. #49 at ¶¶ 55-57. Defendants say that Neumaier contacted psychological staff when plaintiff said he wanted to speak to Schwebke, but they deny that plaintiff said anything about wanting to harm himself.) Later, Neumaier was escorting another prisoner back to his cell when Neumaier saw that plaintiff was bleeding from this right arm and splashing blood on his door. Plaintiff had cut an artery in one of his arms. (Plaintiff says that he waited an hour for Neumaier to

get help before "succumb[ing] to his impulse to harm himself."   Dkt. #49 at ¶ 58.)
Neumaier then contacted a supervisor.   Plaintiff was removed from his cell, placed in
restraints, taken to the health services unit for medical treatment and then placed in
observation status.

On July 3, defendant Andrea Nelson (a psychological associate) met with plaintiff "for
review of his observation placement."   Nelson noted that plaintiff "was calm and denied
current intent to harm himself.   He asked to come out of Obs so he can have property.   I will
follow up."   Nelson kept plaintiff in observation because of "recent serious self-harm."

On July 4, 2009, plaintiff again engaged in self-harming behaviors at the end of
second shift.   Defendant Neumaier did not work second shift on July 4.   (Plaintiff attempts
to dispute this fact, but the evidence he cites does not address the issue of when Neumaier
was working.)   Plaintiff was taken to the hospital to be treated for his injuries and then
placed back in observation.

In an evaluation dated July 7, 2009, defendant Schwebke concluded that plaintiff
engaged in self-harm "in part because of poor coping skills but [also] for secondary gain."


OPINION

All of plaintiff's claims are governed by the Eighth Amendment, which guarantees the
right to be free from cruel and unusual punishment.   The Supreme Court has interpreted this
language to mean that the "punishment must not involve the unnecessary and wanton
infliction of pain."  Gregg v. Georgia, 428 U.S. 153, 173 (1976).   Thus, a claim under the

Eighth Amendment has an objective component and a subjective component, but the elements for proving a violation in a given case depend on context.  Whitley v. Albers, 475 U.S. 312, 320 (1986) ("The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should . . . be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.").  See also Rhodes v. Chapman, 452 U.S. 337, 346 (1981) ("No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual.").

In some cases, the Supreme Court and the Court of Appeals for the Seventh Circuit have described the objective component of an Eighth Amendment violation as a deprivation of "the minimal civilized measure of life's necessities" or, more simply "the serious deprivation of basic human needs," such as food, clothing and shelter.  E.g., Rhodes, 452 U.S. at 347; Vinning-El v. Long, 482 F.3d 923, 924 (7th Cir. 2007); Gillis v. Litscher, 468 F.3d 488, 494 (7th Cir. 2006). Courts have also framed the question as whether conditions violate "contemporary standards of decency," Rhodes, 452 U.S. at 346; Thomas v. Ramos, 130 F.3d 754, 763 (7th Cir. 1997), and whether the conditions violate "the dignity of man." Hope v. Pelzer, 536 U.S. 730, 738 (2002).  Perhaps the most common formulation is whether the plaintiff was exposed to a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S. 825 (1994); Atkins v. City of Chicago, 631 F.3d 823, 830 (7th Cir. 2011); Prude v. Clarke, 675 F.3d 732, 734 (7th Cir. 2012); Alvarado v. Litscher, 267 F.3d 648, 651-52 (7th Cir. 2001); Dixon v. Godinez, 114 F.3d 640 (7th Cir. 1997); Antonelli v. Sheahan, 81 F.3d 1422, 1431 (7th Cir. 1996).

In the context of medical care, the question is framed as whether the plaintiff has a serious medical need.  Estelle v. Gamble, 429 U.S. 97 (1976); Greeno v. Daley, 414 F.3d 645, 653-54 (7th Cir. 2005).  With the exception of cases involving attempted suicide, e.g., Rosario v. Brawn, 670 F.3d 816, 822 (7th Cir. 2012), Minix v. Canarecci, 597 F.3d 824, 833 (7th Cir. 2010), the Court of Appeals for the Seventh Circuit has decided few cases regarding the requirements of the Eighth Amendment in the context of mental health care, but generally this court has applied a standard similar to that for medical care, substituting a "serious mental health need" for a "serious medical need." E.g., Payette v. Hoenisch, 2009 WL 1731939, *1 (W.D. Wis. 2009); Marshall v. Walsh, 2008 WL 4949921, *5 (W.D. Wis. 2008); Almond v. Grams, 2007 WL 5641156, *6 (W.D. Wis. 2007).  See also see also Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004) (under Eighth Amendment, "mental health needs are no less serious than physical needs"); but see Lewis v. Sullivan, 279 F.3d 526, 529 (7th Cir. 2002) (stating in dicta that "suicidally depressed are entitled, at most, to precautions that will stop them from carrying through; they do not have a fundamental right to psychiatric care at public expense"). The common theme across the different formulations of the objective component is that the deprivation must be "extreme;"  "restrictive" and "uncomfortable" conditions are not sufficient to prove an Eighth Amendment violation, Rhodes, 452 U.S. at 347; Thomas, 130 F.3d at 763.

With respect to the subjective component in the context of a claim about a prisoner's conditions of confinement, the plaintiff must prove the prison officials were "deliberately indifferent to the adverse conditions." Rice ex rel. Rice v. Correctional Medical Services, 675

13

F.3d 650, 665 (7th Cir. 2012).  An official is deliberately indifferent when he is subjectively aware of the condition or danger complained of, but consciously disregards it.  Id.

### A.  Conditions of Confinement

Plaintiff is proceeding on a claim that defendants Byron Bartow, Brian Bantleon, Michael Meisner, Janet Nickel, Tim Douma and Donald Morgan have exacerbated his mental illness by housing him in segregation.  Jones 'El v. Berge, 164 F. Supp. 2d 1096, 1116 (W.D. Wis. 2001) (when conditions of segregation "are so severe and restrictive that they exacerbate the symptoms that mentally ill inmates exhibit," this may result in cruel and unusual punishment).  The parties did not submit any proposed findings of fact about the personal involvement of any of these defendants other than Meisner and Nickel.  I understand plaintiff to contend that the other defendants are high ranking officials responsible for plaintiff's conditions of confinement.  Because I am resolving this claim on other grounds, I need not consider the issue of personal involvement.

Defendants argue that they are entitled to summary judgment on this claim for the simple reason that plaintiff has not adduced any evidence that the conditions of segregation exacerbated any mental illness that he has, or, if they did, that any of the defendants was aware of that fact.  In particular, they point out that plaintiff has not submitted an opinion from an expert supporting his claim or any evidence showing that any of the defendants believed that plaintiff's conditions of confinement were causing him serious mental harm. In response, plaintiff does not deny that he must show that both that the conditions of

segregation exacerbated his mental health and that defendants knew about the harmful effects. Scarver v. Litscher, 434 F.3d 972, 975-76 (in case involving claim that segregation exacerbated plaintiff's mental illness, requiring plaintiff to show that defendants knew of connection between conditions and plaintiff's mental health). However, he argues that a reasonable jury could make both of these findings from three types of evidence: (1) defendants' admissions that plaintiff harmed himself multiple times while in segregation; (2) pictures showing plaintiff's injuries caused by his acts of self-harm; and (3) plaintiff's own opinion that the conditions of segregation exacerbated his mental illness.

This evidence cannot carry the day for plaintiff. The first two groups of evidence show that plaintiff harmed himself, but they do not show *why*. Plaintiff cites no authority for the proposition that it may be inferred reasonably that a prisoner's conditions are exacerbating his mental illness solely from the fact that he harmed himself while housed in those conditions. This would require assumptions that plaintiff was harming himself because of the conditions of segregation rather than some other reason personal to him *and* that his self-harm was the result of a deterioration of his mental health rather than a calculated maneuver to obtain a particular result, such as a transfer or other secondary gain. According to the parties' undisputed facts, it appears that there was at least one instance of self-harm in 2009 when plaintiff was *not* housed in segregation.

Plaintiff relies on his own opinion to prove the connection between his conditions and the effect on his mental health, but it is questionable whether plaintiff is qualified to give such an opinion. Even if he were, plaintiff cites little evidence for the view that any of

the *defendants* came to that conclusion.  Although plaintiff told some of the defendants that he believed his conditions of confinement were adversely affecting his mental health, he cites no authority for the view that defendants are required to credit a prisoner's self-diagnosis.

Another problem with plaintiff's evidence is that he fails to attribute his acts of self-harm to any particular condition of confinement or combination of conditions.  For example, he does not argue that 24-hour lighting, lack of exercise or sunlight, extreme temperatures, or a combination of those conditions harmed him, so he has forfeited any claim that defendants could have alleviated or ameliorated any harm to his mental health by tweaking the conditions of segregation.  Rather, his claim seems to be that the mere fact of isolation exacerbated his mental illness.

Some cases suggest that the evidence is mounting regarding harmful effects that segregation can have on mental health, particularly with respect to those prisoners who are already mentally ill.  Scarver, 434 F.3d at 975-76 ("There is an extensive literature on the effect of . . .  isolation . . . on mentally disturbed prisoners."); Rice, 675 F.3d at 666-67 ("[P]rolonged placement in segregation might have adverse effects on someone in Rice's condition.").  However, one important difference in those cases is that the plaintiff had expert testimony about the effect of segregation on the mental health of the particular prisoner at issue, testimony which is missing in that case.

Even if I assume that it is obvious that long term segregation is harmful, that is not enough to prevail on a claim under the Eighth Amendment.  Rather, Rice, Scarver and other cases in this circuit all emphasize the importance of the plaintiff identifying a "feasible

16

alternative" to segregation.  Rice, 675 F.3d at 666-67 (affirming dismissal of claim that conditions of segregation violated Eighth Amendment for plaintiff's failure to identify feasible alternative); Walker v. Shansky, 28 F.3d 666, 673 (7th Cir. 1994) ("Whether [segregation] does in fact violate the Eighth Amendment depends on the duration and nature of the segregation and the existence of feasible alternatives."); Meriwether v. Faulkner, 821 F.2d 408, 416-17 (7th Cir. 1987) ("Obviously influencing whether prolonged segregation constitutes cruel and unusual punishment is the existence of feasible alternatives.").

In Scarver, 434 F.3d at 976, the court used blunt language to identify a problem that is relevant to this case:  "the treatment of a mentally ill prisoner who happens also to have murdered two other inmates is much more complicated than the treatment of a harmless lunatic."  Plaintiff is serving a sentence for murdering two people. Prison officials have determined that plaintiff has ties to a gang.  Throughout his multiple incarcerations, plaintiff has continued to assault staff and other prisoners, make threats and destroy property.  From this history, defendants determined that plaintiff should be placed in administrative confinement.

Plaintiff states repeatedly throughout his brief and proposed findings of fact that defendants placed him in administrative confinement "for engaging in self-harming behaviors," but there is little evidence to support that view.  Although conduct reports plaintiff received for harming himself were included in plaintiff's disciplinary history, neither the security director nor the review committee relied on those acts in justifying their decisions to place plaintiff in administrative confinement.  Rather, they relied repeatedly on

17

plaintiff's assaults on *others* and his various acts of destruction of property.  (Plaintiff was placed in disciplinary separation on one occasion for conduct that included "disfigurement." I will discuss that issue below.)  Even if I assume that plaintiff's self-harm played some role in the decision to retain him in administrative confinement, plaintiff does not explain why that would invalidate a decision that was otherwise justified by other factors or even why defendants would be prohibited from considering self-harming behaviors in determining an appropriate placement.  Just as suicidal prisoners are placed in observation status to minimize the chances of further self-harm, prison officials may wish to place prisoners at risk of self-harm in a status that allows them to be monitored more closely.

Plaintiff's position seems to be that defendants were required to release him to general population if there was an indication that segregation was having an adverse effect on his mental health, but that is not the law.  Rather, I am required to give deference to defendants' determination about the most appropriate placement:

> Prison authorities must be given considerable latitude in the design of measures for controlling homicidal maniacs without exacerbating their manias beyond what is necessary for security. It is a delicate balance.  Federal judges must always be circumspect in imposing their ideas about civilized and effective prison administration on state prison officials. The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about the management of prisons; managerial judgments generally are the province of other branches of government than the judicial; and it is unseemly for federal courts to tell a state . . . how to run its prison system.

Scarver, 434 F.3d at 967-77 (internal quotations and citations omitted).

It must be remembered that defendants have a duty not only to respect plaintiff's Eighth Amendment rights, but also to respect the right of other prisoners and staff to be safe.

18

If prisoner officials were to release a prisoner with an assaultive history into general population and that prisoner were then to harm another person, that could expose prison officials to liability under both state tort law and the Constitution.  <u>Farmer</u>, 511 U.S. 825; <u>Santiago v. Walls</u>, 599 F.3d 749, 759 (7th Cir. 2010).

It is true that prison officials recently decided that plaintiff could be released to general population at the Wisconsin Resource Center, but that does not mean that defendants violated the Eighth Amendment by declining to release plaintiff sooner. Although plaintiff had gone some time without assaulting anyone, he had continued making threats of violence and engaging in serious destruction of property until more recently. Perhaps defendants could have acted more swiftly and perhaps they should have given plaintiff more concrete guidance regarding the steps he needed to take to get out of segregation, but these potential criticisms are not so extreme as to make out a constitutional violation.  Particularly in light of  plaintiff's earlier history of violence, I cannot say that defendants violated the Eighth Amendment by exercising caution before subjecting staff and other prisoners to the risk that plaintiff might relapse.  Accordingly, I conclude that defendants are entitled to summary judgment on this claim.

## B. <u>Mental Health Treatment</u>

I allowed plaintiff to proceed on a claim that the mental health treatment he received at the Columbia prison was so inadequate that it violated the Eighth Amendment.  However, in his summary judgment materials, plaintiff identifies no specific deficiencies with the

mental health treatment that he has received.  (In fact, neither side discusses this issue in detail, but, again, it is plaintiff's burden to prove that his mental health treatment was deficient, not defendants' burden to prove that it was adequate.)  His only argument on this claim is that his mental illness could not be treated properly while he was housed in segregation.  Because that is simply a repackaging of his unsuccessful argument that the conditions of segregation violated his Eighth Amendment rights, I am granting defendants' motion for summary judgment on this claim as well.

## C.  Disciplinary Decision

After plaintiff cut himself in June 2009, defendants Lane and Salter ordered him to spend 210 days in disciplinary separation for "disfigurement" and "disruptive conduct."  In the order screening the complaint, I allowed plaintiff to challenge this decision under two Eighth Amendment theories: (1) prison officials may not punish prisoners for behavior they cannot control; and (2) prison officials may not place prisoners in conditions that exacerbate their mental illness.  The second theory fails for the reasons discussed in Section A.  The first theory rests on questionable legal ground, as I acknowledged in the screening order.  Dkt. #13 at 10.  However, even if I assume that it could violate the Eighth Amendment to discipline a prisoner for behavior he cannot control, plaintiff cannot prevail on this claim.

Plaintiff's only evidence to support this claim consists of conclusory statements in his verified complaint that he has a "compulsion to self-harm."  E.g., cpt. ¶ 24, dkt. #49.  Again, plaintiff is not a mental health expert.  However, even if I assume that plaintiff is qualified

to give an opinion on this issue, it cannot carry the day unless plaintiff has evidence that defendants Lane and Salter believed plaintiff could not control his actions.  As I explained in the screening order, a prison official cannot be held liable under the Eighth Amendment for a mistake.  <u>Vance v. Peters</u>, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error [or] negligence . . .  is insufficient to rise to the level of an Eighth Amendment constitutional violation.").  <u>See also</u> <u>Wilson v. Seiter</u>, 501 U.S. 294, 299-300 (1991) (Eighth Amendment "mandate[s] inquiry into a prison official's state of mind" because word "punishment" in amendment implies "intent requirement").

Plaintiff points to no information in front of defendants Lane and Salter that would have led them to believe that plaintiff was powerless to stop himself, not even statements from plaintiff himself.  Lane and Salter are not mental health professionals; their job was to determine whether plaintiff violated disciplinary rules.  Although one can criticize from a policy perspective the decision to discipline a prisoner for engaging in acts of self-harm, I see no basis under the facts of this case for finding that this decision violated the Eighth Amendment, particularly because part of Lane's and Salter's reason for the discipline was to keep plaintiff "in a status where his behavior can be safely managed."  Accordingly, defendants Lane and Salter are entitled to summary judgment on this claim.

D.  <u>Transfer to Green Bay Correctional Institution</u>

I allowed plaintiff to proceed on a claim that defendants Lane and Fait violated plaintiff's Eighth Amendment rights by transferring him to the Green Bay Correctional

Institution even though they knew that Green Bay was not an appropriate placement for him and that there was a substantial risk that he would harm himself there.  Again, plaintiff has not adduced sufficient evidence to raise a genuine issue of material fact regarding defendants' knowledge.  Although plaintiff says that he told Lane and Fait  that Green Bay was a bad placement, he cites no reason that they should have credited his statements.  In particular, he cites no relevant differences between the conditions of confinement or the available mental health treatment at the Green Bay prison over the Columbia prison where plaintiff wanted to stay.  Further, it is difficult for plaintiff to argue that defendants should have known that Columbia was a better placement than Green Bay when he had tried to harm himself *twice* at Columbia just a few days earlier. Although plaintiff says he would have preferred to be transferred to the Wisconsin Resource Center, it is undisputed that a referral was pending but defendants did not have the authority to transfer plaintiff there at the time. Defendants Lane and Fait are entitled to summary judgment on this claim.

### E.  Failure to Prevent Self-Harm

Plaintiff is asserting claims that prison officials failed to prevent him from engaging in three acts of self-harm.  The standard for these claims is whether a particular defendant knew of a substantial risk that plaintiff would seriously harm himself but that defendant consciously refused to take reasonable measures to prevent the harm.  Rice, 675 F.3d 650; Frake v. City of Chicago, 210 F.3d 779 (7th Cir. 2000); Tesch v. County of Green Lake, 157 F.3d 465, 475 (7th Cir. 1998); Estate of Cole by Pardue v. Fromm, 94 F.3d 254 (7th Cir.

1996); <u>Hall v. Ryan</u>, 957 F.2d 402 (7th Cir. 1992); <u>Mombourquette ex rel. Mombourquette</u> <u>v. Amundson</u>, 469 F. Supp. 2d 624 (W.D. Wis. 2007).  Defendants do not argue that the harm plaintiff experienced during any of these incidents was not serious enough to implicate the Eighth Amendment, so I do not consider that issue.  Rather, defendants argue that they were not aware that plaintiff was going to harm himself.

With respect to the incidents on August 29, 2007, and July 2, 2009, plaintiff has raised a genuine issue of material fact about defendants' knowledge.  In particular, he cites his own testimony that he told defendants Vandenbrook, Bittleman and Vasos on August 29 that he feared he would hurt himself and wanted to be placed on observation, but they failed to take any action to help him.  Instead, Vasos told plaintiff, "The only way you can go to observation is if you hurt yourself."  Similarly, plaintiff says that he told defendant Neumaier on July 2 that he wanted to see psychological staff and that he was worried he was going to harm himself, but defendant Neumaier failed to take any action for approximately one hour before plaintiff cut himself.  Although defendants deny that plaintiff told them about thoughts of self-harm, I must accept plaintiff's version of events as true for the purpose of summary judgment.  <u>Bombaci v. Journal Community Public Group, Inc.</u>, 482 F.3d 979, 986 (7th Cir. 2007).

With respect to the last incident of self-harm on July 4, 2009, plaintiff has failed to adduce evidence that any of the defendants consciously disregarded plaintiff's health or safety.  In fact, plaintiff cites no evidence in response to defendants' proposed findings of fact that tie any of the defendants to an act of self-harm occurring on this date.  Although

23

plaintiff attempts to dispute defendants' proposed finding of fact that defendant Neumaier did not work on July 4, the evidence plaintiff cites includes no dates or other information that would allow a reasonable jury to infer that Neumaier was present that day, much less that he refused a request to help plaintiff then.

In his complaint, plaintiff alleges that defendants Nelson and Schwebke failed to stop him from harming himself on another occasion, but he does not address this issue in his responses to defendants' proposed findings of fact, so that claim is forfeited.  Procedure I.B.4 ("The court will not consider facts contained only in a brief."). Even in his brief, plaintiff never identifies a specific incident in which these two defendants failed to help him. Without more specific evidence, plaintiff cannot raise a genuine issue of material fact about any alleged violations by Nelson and Schwebke.  LaFary v. Rogers Group, Inc., 591 F.3d 903, 908 (7th Cir. 2010) (affirming dismissal when plaintiff failed to adduce evidence of when critical events occurred); Drake v. Minnesota Mining & Manufacturing Co., 134 F.3d 878, 887 (7th Cir. 1998). ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.")


ORDER

IT IS ORDERED that

1.   Plaintiff Shaun Matz's motion for leave to file a sur-reply, dkt. #109, is GRANTED.

2.   The motion for summary judgment filed by defendants Michael Vandenbrook, Kurt Schwebke, Andrea Nelson, Sean Salter, Joanne Lane, Linda Fait, Travis Bittleman, Steven Vasos, Benjamin Neumaier, Michael Meisner, Janel Nickel, Brian Bantleon, Donald Morgan, Byron Bartow and Tim Douma, dkt. #84, is DENIED with respect to the following claims:  (a) on August 29, 2007 defendants Vandenbrook, Bittleman and Vasos were aware of a substantial risk that plaintiff would harm himself, but they took no action to help plaintiff; and (b) on July 2, 2009, defendant Neumaier was aware of a substantial risk that plaintiff would seriously harm himself, but Neumaier took no action to help plaintiff.

3.   Defendants' motion is GRANTED in all other respects.

4.   The third amended complaint is DISMISSED as to the following defendants: Schwebke, Nelson, Salter, Lane, Fait, Meisner, Nickel, Bantleon, Morgan, Bartow and Douma.

Entered this 19th day of August, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

25